By the Court.—Sedgwick, Ch. J.
It is not important—it might mislead—to try to find a name among the terms of the law, that would denote the relations of the parties and would imply the whole of their obligation. The issues are confined to the relations of the parties between themselves. There is no inquiry as to the rights of third parties. The written contract is the summary of all they were to do or omit to do. If that discloses partnership relations in some respects, it is such a partnership as the writing describes. It may be *140 limited by conjunction with obligations that specifically are characteristic of a sale or joint adventure. The point to be reached is the intention of the parties, as manifested by their written agreement. Of course the situation of the parties.and the nature of the business, may properly be looked at for the purposes of construction. But first let the writing be considered. The order of the clauses is not important, compared with the natural order of the facts they refer to.
In the first place, the defendant was to manufacture the mattings in his Allepy factory. Then he was to send them forward to New York, shipping them at Allepy or Cochin. Invoices were to be made, to accompany them. On these invoices the price of the matting was to be specified. The agreement stated what the prices should be at the beginning of the shipments, but provided for their being changed in the future. To these prices, nothing, down to the shipment at Allepy or Cochin, should be added. The prices “are to be free on board at Allepy. ’ ’ But to these invoice prices, were to be added subsequent expenses of freight, insurance and the like, down to the shipping of the matting on board of the vessel for America. The responsibility of the' plaintiffs commenced at the time of the shipment on the vessel for America. All the matting made by the defendant was to be forwarded to the plaintiffs, or as they might otherwise direct. The plaintiffs, by a necessary implication from the specific terms of the agreement, were to sell the matting after -their arrival here. Thfey might have agents for sale, but they were responsible for the sale and its proceeds.
In fact they did sell, through Archer & Bull, by such an arrangement that Archer & Bull acquired a right, as to plaintiffs, to be their agents for sale. Nevertheless, all this was in fact consistent with the duty of the plaintiffs, established incontrovertibly by the written contract, that they should be responsible for the sale of *141 the matting. In distributing the rights of the parties the facts must be looked at as if the proceeds were in the hands of the plaintiffs.
If the agreement made no special reference to the reimbursement to the defendant for the mattings he had shipped, the law would imply that the parties intended it should be made. The quantum of reimbursement would be fixed by the contract in its reference to the price in the invoice, to which, nothing in his favor should be added, down to shipment at Allepy. Reimbursement would also be made to him or to plaintiffs, of such subsequent expenses as each paid. The agreement, however, has special clauses which substitute another, for this method of preventing the defendant from parting with matting for no compensation. The agreement provides that the defendant is to be paid for his matting in India, in advance, “as it may be sent forward from his factory.” In fact that was done. If nothing were said, as to who should pay, the plaintiffs, who were to get the goods and the proceeds, and were the contractors, would be intended as the persons. The word “pay,” in the contract, does not imply that the plaintiffs were not to be reimbursed the amount they paid, but it has peculiar significance as to the dispute, which will be noticed hereafter.
The contract declares that the matting is to be sent forward for the joint account, both in profits and losses, of the parties, “ half and half to each party.”
If there were nothing more in the agreement, it could be said, without argument, that the profits would be the difference between the proceeds of the sale on one side and on the other side the invoice price, and the subsequent expenses from Allepy to Calcutta, then to America, and of the sales. There might be a loss, of course. That would be ascertained in a like manner.
The learned counsel for the appellant argues that the clause, in which provision for payment to defend *142 ant occurs, calls for a different construction. One is, the plaintiffs “ are to keep or cause to be kept good banker’s credit at Calcutta, India, at all times, sufficient to pay for the matting there, as it may be sent forward from the factory.”
The practical importance of the matter now to be considered is, that the plaintiffs did keep or cause to be kept good banker’s credit as provided. To secure the necessary remittances the plaintiffs made an agreement with the persons who in fact established the credit in Calcutta for them. If they had bought bills of exchange or paid contemporaneously the compensation, the real nature of the transaction would have had nothing to obscure its significance, and the present controversy would not have been possible. It would have been clear, that this clause described what the plaintiffs were bound to do, in consideration of which they were to receive a specified part of the profits. But the parties here, with whom the plaintiffs made the arrangements for placing the credits in Calcutta were Archer & Bull. For this, the plaintiffs agreed that they should receive, as a compensation, a certain portion of the profits which would be made under the contract in this case. Archer & Bull were to be the agents to sell, and out of the proceeds of the matting they were to take their compensation. Archer & Bull, in making out the account of sale, first stated the profits, as we have said they should be ascertained, then deducted and retained one-quarter of these profits, as their compensation. After this, the plaintiffs credited defendant with two-fourths of the profits, and continued so to do. They now say that there was a mistake, and that, in order to ascertain the profits, the one-fourth belonging to Archer & Bull should have been deducted before declaring the profits. As Archer & Bull were to have one-fourth of the profits referred to in the written contract, it does not seem to be a possi *143 ble reckoning to find' the profits as between plaintiffs and defendant by first deducting Archer & Bull’s one-quarter. The case must be looked at as if the paying the compensation was a transaction by itself.
The argument is, that the compensation paid was an expense of the joint account, and should be charged to it. When did the joint account begin ? As I have said, this and all other particulars are to be found in the written contract. Because that written contract has for its object a joint account, it does not follow that covenants in it made by the parties individually, are to be performed on the joint account. Every partnership agreement shows this. In the nature of the case, each individual who contributes capital, though that capital will be used in the future for the joint interest, does it in performance of his promise, and of course at his own expense. The money does not reach the condition of being capital, until it is given in, and up to that point the expenses attendant upon obtaining it are personal. In this case, it was an individual promise of the plaintiffs to place the credits in Calcutta. Until, at least, they were so placed, the joint account had no benefit from them. It may be questioned, whether at that particular point, they were there finally at the risk of the plaintiffs. At least, there is an intimation as to this in the provision that the responsibility of the plaintiffs commenced with the shipment on board the vessel for America. The plaintiffs were bound to perform this promise at their own expense. The use of the words “ sufficient to pay for the mattings ” is decisive on this point. If one-half of what was paid by plaintiffs, in order to procure these credits should be charged against defendant, the credit would not be sufficient to pay. That would plainly be so if he paid the expense at the time he used the credit. It is the same when charged to him afterwards. If the provision for this kind of payment *144 to him had not been made, he would have received the invoice price out of the proceeds. It was not the in tention of the agreement, that he should get less under the operation of an individual promise by the plaintiffs to advance to him enough to pay for the mattings.
There was another provision that respected the change that might be made in the invoice price. The defendant was to keep a factory account. That account was to be made in a way particularly described. On one side was to be the full quantity of the matting made, to be entered at the invoice prices, and all items for which the factory should have credit. If the result showed that there was a credit sufficiently large to justify the reduction of the invoice prices, then they should be reduced, or if the balance were the other way, the invoice price was to be raised. This provision had importance in ascertaining the invoice price, or what for the purpose of the agreement would be considered cost price, and in showing how many mat-tings were manufactured, but has no tendency to induce a construction of the plaintiffs’ obligation to advance the credit, different from the one that has been given. It would not be correct to say that because the defendants were paid for the expense of making their mattings, therefore the plaintiff should be paid for the expense of obtaining the credits, which he caused to be advanced. On this point, many things arising from the nature of the business might be said. It may be sufficient to advert to the particular intention, already noticed, of the contract. The defendant was to be reimbursed these expenses only, however, through the operation of the fixing of a cost price. The agreement particularly says, these expenses, through the price for the matting, shall be paid by these credits, or, in other words, by these plaintiffs. The expenses of obtaining the credit cannot be shifted on to the goods.
If there were any ambiguity in the language of the *145 ■contract, the accounts between the plaintiffs and Archer & Bull, and the contemporaneous dealings and declarations, lead to the conclusion that we have announced from the face of the writing. For this reason, the disposition below of the sixth claim by plaintiffs was correct.
If there were any doubt on the facts as to whether there was any good-will of a business which should be ■disposed of for the parties interested in the business, the terms of the contract made a conclusive reference to the matter. So far as the factory was concerned, the contract gives to the plaintiffs a right to a refusal ■of it, at a price which the defendant might fix as he pleased, and nothing more. Only, he could not sell it to a third party for a sum whicli the plaintiffs would be willing to give. He could keep it for himself as long as he. pleased. Good-will is based upon the likelihood of a business retaining its former customers.
As to defendant, this business had but one ■customer—that was the firm of the plaintiffs. The plaintiffs, through Archer & Bull and their other agents,, had perhaps, in a sense, certain customers. The conduct of the defendant has not disturbed the relation ■of the customer to plaintiffs. The defendant was not bound to continue shipping mattings for the customers to buy.
The so-called trade-marks were not in any aspect partnership or joint assets, under this agreement. The plaintiff’s claim, on the evidence, is, that these trade-marks were their exclusive property. They, on-the contract, permitted the defendant to use them on the mattings. It was this use, and not a title to the trade-marks, that was joint property in a sense most favorable to plaintiffs. If, when the joint business was ended, the defendant continued to use the trademarks unlawfully, the plaintiffs would have an equitable cause of action, but it would not be within the .scope of the present action, which concerns partnership *146 dealings only. A decision as to whether the figures and letters were trade-marks, does not seem to be called for.
The amount that the plaintiffs, acting for themselves and defendant received by way of sale of scrip, &c., in reality reduced the amount of premium that one of the plaintiffs, acting for them all, paid for insurance of the mattings to New York. They should be credited for the amount they actually paid Archer & Bull, who retained part of the proceeds of the scrip, and were the plaintiffs’ agents. The arrangement on this point between them, did not bind the defendants.
It is impossible to say, that the referee’s exercise of discretion, in refusing to allow the plaintiffs, on the rebutting case, to interpose other claims, was not justified by the facts.
The same should be said of the allowance granted. The plaintiffs made claims of a specific nature, sufficient in amount to uphold the allowance. It was an unusual and difficult case. The order must be affirmed.
Judgment affirmed, with costs.
Russell, J., concurred.